THE INDIANAPOLIS, CINCINNATI, AND LAFAYETTE RAILROAD COMPANY *v.* HAMILTON.

RAILROAD.—*Pleading.*—*Negligence.*—A complaint against a railroad company charged that through the fault, misconduct, and negligence of the servants and employees of the defendant in running the locomotive and train out of their regular time and at a high rate of speed, to wit, forty miles an hour, and without giving any of the proper signals of their approach, the locomotive struck and killed two mules of the plaintiff, then and there upon the railroad track, at a point where a highway crossed the railroad.

*Held,* that this was a sufficient statement of negligence.

SAME.—*Signals.*—There is no statute in this State that requires railroad companies to blow the whistles or ring the bells of their locomotives on approaching a highway crossing, but that duty may devolve upon them in the exercise of ordinary care, without a statute. Whether in a given case ordinary care requires the making of such signals, is a question for the jury.

From the Decatur Circuit Court.

*T. A. Hendricks, O. B. Hord, A. W. Hendricks, W. Cumback,* and *S. A. Bonner,* for appellant.

*B. W. Wilson, E. R. Monfort,* and *W. H. Carroll,* for appellee.

WORDEN, J.—Complaint by the appellee against the appellant, alleging, in substance, that, on, etc., the defendant was the owner of a railroad running through the counties of Dearborn and Decatur, in said State, on which she was running a locomotive and train of cars; that said locomotive and train of cars, while being run as aforesaid through the county of Dearborn, through the fault, mis-

conduct, and negligence of the servants and employees of the defendant, in running the locomotive and train out of their regular time, and at a high rate of speed, to wit, at the rate of forty miles per hour, and without giving any of the proper signals of their approach, struck and killed two mules of the plaintiff and injured a third, then and there upon the railroad track, without the fault of the plaintiff, at a point where a public highway crossed the railroad.

A demurrer was filed to the complaint, which was overruled, and the defendant excepted. Issue, trial, verdict, and judgment for the plaintiff.

It is objected that the complaint does not set forth with sufficient particularity and certainty the negligence imputed to the defendant. We think, upon an examination of form No. 14, prescribed by the legislature, in connection with the statute on the subject of forms (2 G. & H. 373, 377), that the complaint is sufficient.

We proceed with the case made by the evidence, as it is claimed that the verdict is not sustained thereby.

The plaintiff, by his agents or servants, was moving a drove of one hundred and fifteen mules to Cincinnati, along a highway that was crossed by the defendant's railroad. When the mules arrived at the crossing, they were stopped and held back by those having them in charge, and a hand was sent on ahead to ascertain train time, who learned that the up train would be due in a few minutes, and that the down train was behind time, but how much does not appear. The mules were held back until the up train had passed, when they were started across, the parties having them in charge having examined and listened, and not hearing any approaching train. When about one-half of the mules had crossed the track, the whistle of the down train was heard. The mules "strung out" a good deal, as mules will, according to the testimony, and the drove covered about one hundred yards in length in crossing the track; and although the hands were hurrying them across as fast as possible, before they could do so the train came on and did the injury complained of.

There is a switch one and a half miles above the crossing, at a place called Sunman's Station, where the up and down trains pass each other.   At the time the up train passed, the down train (the one doing the injury) was standing on the switch mentioned, and when the up train passed, the down train backed off the switch and proceeded on its way.   There would be, according to the testimony of the engineer, ten or eleven minutes between the crossings of the highway by the up and down trains.   The down train was behind time, but how much it is difficult to determine from the evidence.   The up train must have been equally behind, as they passed each other at the usual place.   The engineer says they may have been six or seven minutes late.   There is a curve in the railroad between Sunman's and the crossing, commencing about one hundred yards from the crossing, and it is to be inferred from the evidence that the crossing can not be seen from the train when beyond this curve.   There is a down grade of seventy or eighty feet to the mile, according to the testimony, commencing about four hundred yards above the crossing.

There is some discrepancy in respect to the speed at which the train was running.   William H. Moore testifies that he got on at Indianapolis, where the train was two or three hours late, but don't recollect whether any time was made up or not.   Attention was called to the speed, but can't say whether before or after the accident.   Can't say it was running faster than passenger trains usually do on a down grade.   General Foley was on the train, got on at Greensburg.   He says: "The train was behind time, but I don't know how much. I have travelled a good deal over this road.   The train was running very fast, so much so as to attract the attention of passengers.   The speed of the train, I thought, was much greater than ordinary.   The train always goes rapidly on these heavy down grades, but this was running more rapidly than usual."

The plaintiff was on the train.   He says: "The train was behind time an hour or two.   I travelled over this road a

The Indianapolis, Cincinnati, and Lafayette R. R. Co. *v.* Hamilton.

good deal. The train was running at a rapid rate. I did not notice any check in the motion of the train. I thought it was going very fast, faster than usual."

The engineer on the train, James Watson, says : " We were running at the usual card time, twenty-five to thirty miles per hour. There were five cars. I was about fifty yards from the mules when I saw them. I signaled down breaks immediately, and felt the breaks applied. (In this he is corroborated by Gen. Foley, and others.) Could not check the train ; it was impossible to check the train there. I did all in my power to check the train, but it was impossible to do so. It would take a quarter of a mile to stop the train on that grade." A fireman testifies that they were running at about the usual speed.

Two questions arise on the facts and evidence. 1st. Was the plaintiff, through those having the mules in charge, guilty of any negligence that contributed to the injury? 2d. If the plaintiff was not guilty of such negligence, did the injury occur through the negligence and want of care on the part of the defendant?

The jury found by their verdict that the plaintiff was not guilty of such negligence, and we think they were justified in so finding. He, or rather those having charge of the mules, did, as it seems to us, all that could be reasonably expected of ordinarily careful and prudent men. When they came to the crossing, they did not rush carelessly across, but stopped the drove and sent ahead to make inquiries in respect to the time for the passing trains. The up train having passed, and having learned that the down train was behind time, but not knowing how much, but having examined and listened for its approach and not hearing it, we think it quite reasonable for them to have supposed that they might safely undertake to cross with their drove. It does not appear that the men in charge of the mules knew where the trains passed each other, or where there was a switch at which they could pass ; but they knew that before the down train could arrive at the crossing, both trains must meet at a

switch somewhere above, in order that the down train might pass the one just gone up; and under these circumstances, we do not think there was negligence or want of care in undertaking to make the crossing. But suppose it be said that it was the duty of the men to have learned where the trains passed each other before undertaking to cross. Without deciding that such was their duty, it may be observed that had they known the distance from the crossing to the switch, we cannot say that there was any negligence on their part. Before the down train could be at the crossing, three miles had to be run; besides the down train had to back off the switch at Sunman's. This, according to the engineer, would take ten or eleven minutes. We are not advised by the evidence, or otherwise, that there is anything to prevent a drove of one hundred and fifteen mules from passing any given point in ten minutes or much less time.

We proceed to the second question. Was the defendant, through her agents, guilty of negligence? The jury, by their verdict, have found that she was.

The train, by which the injury was done, was running, doubtless, at a high rate of speed, and was not so held in check that it could have been stopped after the mules were discovered by those having it in charge, and before reaching the crossing. It was, perhaps, not necessary that it should have been thus held in check. *Warner* v. *The New York Central Railroad Co.*, 44 N. Y. 465.

There was, as we have seen, a heavy down grade, commencing about four hundred yards above the crossing, and we think it clear enough from the evidence that it was impossible for the engineer to stop the train after discovering the mules before reaching the crossing. Owing to the curve in the line of the railway, a person standing at the crossing could see up the road only about two hundred yards.

We are led to inquire what signals the defendant gave of the approach of her train to the crossing. There does not appear to have been any ringing of the bell. The whistle was blown, but how far before reaching the crossing cannot

be determined with certainty.   J. P. Root, a witness for the plaintiff, says:   "I can't tell how far they were from the crossing when the whistle was blown.   They were running pretty rapidly; were not over a quarter of a mile away from crossing when the whistle was blown; not five minutes from the time the whistle was blown until the train was at the crossing.   I had no time to drive the mules off the track. Can't say whether cars in sight of crossing when the whistle was blown."   In another place he says:   "The train whistled about the time it came in sight of the crossing."   Another witness for the plaintiff, Cassius Hamilton, says:   "The whistle was blown about seventy-five or one hundred yards from the crossing.   It was one long whistle.   When the whistle sounded, it was in sight.   It whistled as it came around the curve.   We saw the train before the whistle.   We could see the train before they could see the crossing. When the train whistled, the mules were crossing; and when the whistle sounded, the mules stopped.   The time was so short that we could do nothing.   The train ran through the mules."   On cross-examination, he said: "The whistle was blown as soon as the train came in sight of the crossing. It was a quick, long scream.   From the place where the whistle sounded first to the crossing is seventy-five to one hundred yards."

William Hamilton, a son of the plaintiff, who was with the drove, says:   "It gave one long whistle, about seventy-five or one hundred yards from the crossing.   Could see the train before the whistle sounded."

James Watson, the engineer on the train, on behalf of the defendant, testified:   "I was about fifty yards from the mules when I saw them.   I signaled down breaks immediately and felt the breaks applied. Could not check the train. It was impossible to check the train there."   Another witness, testifying on behalf of the defendant, says:   "I was fireman on this train.   I was about forty yards from this crossing when I saw the mules.   I was out on the engine in

The Indianapolis, Cincinnati, and Lafayette R. R. Co. *v.* Hamilton.

front, oiling the valves.   The engineer whistled down breaks, and I felt them applied."

This is the only  evidence  on  the  subject  of  the  whistle being blown;  and we think the jury may well have inferred from it that the whistle was not blown at all  until  the train was about rounding the curve and  within  one  or  two hun- dred yards of the crossing.   We have  no  statute, that  we are aware of, that requires  railroad companies to blow  their whistle or ring their bell, before  reaching the crossing  of a highway; but that duty may devolve upon them without any statute.   Ordinary  care  may  require it.   In this case, the speed at which  the  train  was moving,  the  curvature of the road, rendering it impossible for those  in  the  management of the train to see the crossing at any considerable distance from it, and for persons at the crossing to see an  approach- ing train at  any considerable  distance off,  the  heavy  down grade, rendering it difficult or  impossible  to stop  the  train within a short distance, and the fact that the train was behind time, leaving persons desirous of crossing  the  track upon the highway without any notice of the precise time at which the train might be expected, rendered  it quite proper that a signal should be given  of the approach of the train, at such reasonable distance from the crossing as would have enabled persons crossing or about to cross to guard against collision or accident.   The jury have found by  their verdict that  this omission was negligent, and we  are not disposed  to disturb their verdict.   See *Beisiegel* v. *The New York Central Railroad Co.*, 34 N. Y. 622.   We cannot say but that, if the  whistle of the approaching train had been blown a half a mile before reaching the crossing (the usual distance, as was testified, of sounding the whistle before  reaching  a  station), the  mules might have been separated and  removed  from  the track so as to have avoided the collision.

The judgment below is affirmed, with costs.